**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Johnie Wright, Jr.,                     )
                                        )
    Plaintiff,                       )     Case No.: 1:20-cv-00369
                                        )
    vs.                              )     Judge Michael R. Barrett
                                        )
Stagnaro Distributing, LLC,             )
                                        )
    Defendant.                       )
                                        )

## OPINION & ORDER

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (Docs. 27, 31, 32) and Defendant's Motion for Summary Judgment (Docs. 28, 30, 33). For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment will be DENIED and Defendant's Motion for Summary Judgment will be GRANTED in part and DENIED in part.

## I.  BACKGROUND

Plaintiff Johnie Wright, Jr. was first employed by Defendant Stagnaro Distributing, LLC[1] as a delivery "route driver" in late 2014.  (Wright Dep., Doc. 26 PAGEID 847–49 (12:1–14:3), PAGEID 878 (43:2–5)).  He worked Monday through Friday.  (*Id.* PAGEID 877–78 (42:7–43:15)).  Wright was terminated for excessive absenteeism approximately two years later in 2016.  (*Id.* PAGEID 865–66 (30:23–31:5), PAGEID 879 (44:7–17)).[2]  He

---

[1] Stagnaro is a distributor of alcoholic and non-alcoholic beverages throughout Ohio, Kentucky, and Indiana.

[2] Wright explained, "But I understood it, why they let me go the first time.  I was missing a lot of days for my wife's health."  (Doc. 26 PAGEID 866 (31:3–5); *see id.* PAGEID 868 (33:1–13)).

was re-hired to the same position, however, but a different route, in March 2017.  (*Id.* PAGEID 877–78 (42:22–43:1), PAGEID 879–80 (44:18–45:1), PAGEID 880 (45:7–12), PAGEID 881 (46:19–23), PAGEID 882 (47:13–15)).   Upon re-hire, Wright worked Tuesday through Friday, with Monday off.  (*Id.* PAGEID 877 (42:9–19), PAGEID 878 (43:16–22), PAGEID 880 (45:7–12)).

Chris Berkley and Tony Gladen[3] supervise Stagnaro's drivers, dividing them between east and west routes.  They oversee product leaving the warehouse, so they make sure that all drivers are on their trucks and driver helpers[4] are assigned as needed.  (Berkley Dep., Doc. 22 PAGEID 131–32 (7:12–8:25); *see* Lammers Dep., Doc. 24 PAGEID 466–67 (10:1–11:11)).  Based on the location of his route, Wright was supposed to report to Gladen, but he sometimes would report to Berkley.  According to Berkley, "me and Tony work hand-in-hand on setting trucks on a daily basis."  (Doc. 22 PAGEID 134 (10:9–23); *see* Doc. 26 PAGEID 876–77 (41:16–42:6)).

Berkley and Gladen report to John Lammers, Vice President of Operations - Ohio.  (Doc. 22 PAGEID 133 (9:7–10); *see* Doc. 24 PAGEID 464–65 (8:13–9:10)).  Lammers, who assumed that role in 2017, reports directly to General Manager Don Jakubowski.  (Doc. 24 PAGEID 473–74 (17:4–18:2); Jakubowski Dep., Doc. 23 PAGEID 234 (8:13–18)).

Ryan McDaniel is Stagnaro's HR and Safety Manager.  (McDaniel Dep., Doc. 25 PAGEID 597 (8:2–9)).[5]  He replaced Andy Wimberg.  (Doc. 23 PAGEID 235 (9:17–21);

---

[3] Driver supervisor Tony Gladen was not deposed.  (*See* Doc. 28 PAGEID 1254).

[4] A driver helper accompanies a driver on his delivery route and helps him unload product off his truck.  (Berkley Dep., Doc. 22 PAGEID 151 (27:11–16)).

[5] McDaniel assumed this role on April 29, 2019.  (Doc. 25 PAGEID 597 (8:2–6)).

Doc. 24 PAGEID 479 (23:18–19)).  Like Lammers, McDaniel also reports directly to

Jakubowski.  (Doc. 25 PAGEID 597 (8:14–16); Doc. 23 PAGEID 234 (8:13–20)).

**Stagnaro's written policies on accident and injury reporting.**  Stagnaro's

Employee Handbook provides in pertinent part:

**<u>HEALTH AND SAFETY</u>**

<u>EMPLOYEE SAFETY</u>

. . . .

Each employee is expected to obey safety rules and to exercise caution in all work activities.  **Employees must immediately report any unsafe condition to the appropriate supervisor. Employees**, who violate safety standards, who cause hazardous or dangerous situations, or **who fail to report**, or where appropriate, remedy **such situations may be subject to disciplinary action, up to and including termination of employment.**

**In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify the appropriate supervisor.**  Such reports are necessary to comply with laws and initiate insurance and worker's compensation benefit procedures.  A safe work environment requires the cooperation of all employees.

. . . .

<u>WORKERS' COMPENSATION POLICY</u>

. . . .

Every employee, part-time or full-time, is entitled to file a Workers' Compensation claim.  **If an employee is hurt on the job, the employee must first notify the employee's supervisor the same day.**  Ensuing injuries may not be certified if this is not done.  A first report of injury will be filed with the Workers' Compensation insurance by the employee's supervisor.  **It is the responsibility of the employee to report any workplace injuries to his/her immediate supervisor.**  Failing to report can affect whether any benefits are paid.

(Doc. 26-1 PAGEID 1094, 1095 (emphases added)).  Wright received a copy of the

Employee Handbook when he was hired in 2014 and re-hired in 2017.  (Doc. 26 PAGEID

851–52 (16:11–17:9), PAGEID 853–54 (18:7–19:11); Doc. 26-1 PAGEID 1108, 1109).

Stagnaro also has an Employee Safety Manual.  As to reporting injuries, it states:

All work-related injuries must be reported to your supervisor or the Human Resources manager **immediately**.  Failure to immediately report injuries can result in loss of Workers' Compensation benefits. After each medical appointment resulting from a work-related injury, you must contact your supervisor to discuss your progress.  You must also give your supervisor any paperwork that you received at that appointment.[6]

. . . .

Any work-related injury must be reported **immediately** to your supervisor and to Human Resources.  A first report of injury form must be completed.  **Failure to promptly report an injury may result in disciplinary action.**[7]

. . . .

It is our goal to prevent work-related injuries from happening.  We are always concerned when one of our employees is injured or ill due to a work-related condition.  We believe that such absences cost both Stagnaro Distributing and its employees.  We want our injured employees to get the best possible medical treatment immediately to assure the earliest possible recovery and return to work. . . . All work-related injuries should always be reported **immediately** to your supervisor no later than the end of the shift on which the injury occurs.[8]

. . . .

You are encouraged to report any unsafe work practices or safety hazards encountered on the job.  All accidents/incidents (no matter how slight) are to be **immediately** reported to the supervisor on duty.

A key factor in implementing this policy will be the strict compliance

---

[6] (Doc. 26-1 PAGEID 1115 (emphasis in original)).

[7] (Doc. 26-1 PAGEID 1120 (emphases added)).

[8] (Doc. 26-1 PAGEID 1125 (emphasis added)).

to all applicable federal, state, local, and Stagnaro Distributing policies and procedures. **Failure to comply with these policies may result in disciplinary actions.**[9]

Wright received a copy of the Employee Safety Manual when he was hired in 2014 and acknowledged that the policies therein were still in effect at the time of his termination. (*See* Doc. 26 PAGEID 873 (38:3–20), PAGEID 876 (41:13–15); Doc. 26-1 PAGEID 1135).

**Plaintiff's (2018) knee injury.** In January 2018, "on a Friday maybe or Thursday," Wright twisted his knee during a delivery while maneuvering a keg of beer down some wooden steps. (Doc. 26 PAGEID 863 (28:21–22), PAGEID 865 (30:4–6), PAGEID 895–96 (60:15–61:6)). Then-HR Manager Andy Wimberg noticed Wright limping when he returned to the warehouse. (*Id.* PAGEID 896 (61:2–16); *see id.* PAGEID 864–65 (29:21–30:3), PAGEID 1015 (180:9–18)). Wright went to the doctor the following Monday and eventually was diagnosed with a torn right meniscus. (*Id.* PAGEID 896 (61:9–16), PAGEID 899–900 (64:17–65:1), PAGEID 900 (65:6–10)). He filed a workers' compensation claim as to this injury, which Stagnaro certified—that is, did not contest. (*See id.* PAGEID 896–97 (61:17–62:4); Doc. 26-1 PAGEID 1147).

A month or two after his knee injury, Wright requested intermittent leave under Stagnaro's policy in effect under the federal Family and Medical Leave Act (FMLA). (Doc. 26 PAGEID 902–03 (67:1–68:3); *see id.* PAGEID 864–65 (29:8–30:15)). His doctor recommended one-to-two days per month to address pain and swelling when Wright "overdid" it. (*Id.* PAGEID 903–04 (68:16–69:19);[10] Doc. 26-1 PAGEID 1148–51). Wright

---

[9] (Doc. 26-1 PAGEID 1135 (emphases added)).

[10] (Doc. 26 PAGEID 902 (67:1–16) ("Just overdoing it. If I'm up and down steps a lot or things of that. Bending a lot would do it. Walking too much would do it.")).

described his requests for leave as "random." (Doc. 26 PAGEID 904–05 (69:20–70:15) ("It would – most of the time if I had a bad knee, I would call at the proper time; call, hey, my knee is bothering me, I'm not going to make it in today. Or text. Or I would text my supervisor.")). Wright could not recall whether he took the full amount of FMLA leave recommended in 2018. (*Id.* PAGEID 910–11 (75:23–76:20)). The year following, 2019, Wright's doctor again recommended one-to-two days of leave per month to address "flare ups." (*Id.* PAGEID 914–16 (79:2–81:2); Doc. 26-1 PAGEID 1152–55). Wright recalled taking one-to-two days off each month in 2019. (Doc. 26 PAGEID 917 (82:4–23)). In 2020, Wright's doctor increased his recommendation from two days per month to (as many as) four days per month because it was "a better option, so to speak, than to be relying on the cortisone shot." (*Id.* PAGEID 925–27 (90:15–92:2)[11]; Doc. 26-1 PAGEID 1157–60).

**Plaintiff's (2019) finger injury.** Wright smashed his left middle finger "picking" a beer order on May 14, 2019. (Doc. 26 PAGEID 919–20 (84:10–85:23)).[12] He did not "ask for workman's comp.," but was nonetheless given a claim form to complete. (*Id.* PAGEID 920–24 (85:24–86:5); Doc. 26-1 PAGEID 1156). No claim was filed, though. (Doc. 26 PAGEID 922–23 (87:12–88:3)).

**Plaintiff's (2020) foot injury.** At the end of his shift on Thursday, March 12, 2020, Wright pulled a skid—that is, a hard plastic pallet—off his truck and a corner of it landed on top of his foot. (*Id.* PAGEID 963–64 (128:19–129:4), PAGEID 964 (129:13–18),

---

[11] (Doc. 26 PAGEID 927–30 (92:4–95:23), PAGEID 931–32 (96:24–97:15)).

[12] (Doc. 26 PAGEID 889 (54:5–20), PAGEID 892–93 (57:21–58:12), PAGEID 894 (59:4–18), PAGEID 895 (60:8–14)).

PAGEID 965–67 (130:18–132:5)).  The skid hit his big toe on his right foot.  (*Id.* PAGEID 967 (132:13–21)).  At the time he "[d]idn't think nothing of it" because it was "hurt kind of like stubbing your toe against the, you know, table or something."  (*Id.* PAGEID 964 (129:2–4)).[13]  Wright did not immediately report the injury.  (*Id.* PAGEID 969 (134:13–21)).  But because he knew the next day, Friday, was going to be "a real busy day" on his route—including, apparently, delivering to the bar where he hurt his knee in 2018—Wright decided to take an FMLA day.  (*Id.* PAGEID 964 (129:5–10) ("That Friday I took off for my knee because that was the bar day where I had the cellar, the cellars and all that, Northside, the basement and everything.  So my knee was bothering me.  My foot was bothering me a little bit but I don't think nothing about my foot."), PAGEID 973–74 (138:7–139:9)).

Wright's foot felt "worse" on Saturday and Sunday than it did on Thursday and Friday.  (*Id.* PAGEID 974–75 (139:16–140:12)).  Monday, March 16, 2020, however, was "pretty bad," so Wright sought professional medical attention at an urgent care that afternoon.  (*Id.* PAGEID 975–77 (140:13–142:7)).  He was later diagnosed with a fracture. (Doc. 26-2 PAGEID 1211–14).

Once home, Wright responded to a text from John Lammers sent that morning. Lammers asked Wright if he was coming in to work the next day—Tuesday—given that he had taken an FMLA day the previous Friday.  Wright sent a return text at 5:27 p.m., at which time he reported—for the first time to a Stagnaro supervisor—his March 12 foot injury.  (Doc. 26 PAGEID 978–79 (143:24–144:25); Doc. 26-2 PAGEID 1198–200).

---

[13] Wright testified that—when it happened—he rated the pain a "two" on a scale of one-to-ten, with one being "barely hurting" and ten being "excruciating."  (Doc. 26 PAGEID 968 (133:5–15), PAGEID 972 (137:11–21) ("it was just sore")).

Lammers then "turned this information in to Ryan."  (Doc. 24 PAGEID 534–35 (78:2–79:15)).  On Tuesday, March 17, 2020 Ryan McDaniel instructed Wright to send him "a detailed description of what happened and when it happened including date and time" by the end of the day.  (Doc. 26-2 PAGEID 1179–80).  McDaniel further instructed him to get a post-accident exam and drug screen at Concentra, Stagnaro's occupational health medical provider.  (*Id.* PAGEID 1181–83, PAGEID 1208; *see* Doc. 26 PAGEID 983 (148:5–25)).

      **Plaintiff's termination and this lawsuit.**  Wright was terminated on Friday, March 20, 2020 during a telephone call from HR and Safety Manager Ryan McDaniel.  McDaniel told Wright that the paperwork for his workers' compensation claim for the March 12th incident had been submitted to the Bureau, but he was terminated for failure to report his injury in a timely manner as required by Stagnaro policy. (Doc. 26 PAGEID 882 (47:13–17), PAGEID 995–97 (160:16–162:10); *see* Doc. 25 PAGEID 665–68 (76:20–78:1)).  McDaniel testified that he and GM Jakubowski alone made the decision to terminate Wright.  (Doc. 25 PAGEID 673–76 (84:6–87:4)).  McDaniel explained that VP Lammers—even though he oversees the driver (delivery) division—was not involved because "he's not the head of safety."  (*Id.* PAGEID 677–78 (88:10–90:1)).

      On May 8, 2020, Plaintiff filed a three-count Complaint alleging violations of the FMLA (interference and retaliation) (Count 1) and the federal Americans with Disabilities Act (ADA) (and its Ohio counterpart) (Count 2), as well as workers' compensation retaliation in violation of Ohio Rev. Code § 4123.90 (Count 3).  (Doc. 1).  Stagnaro moves for summary judgment on all three counts.  Wright moves for summary judgment as to Count 1, his FMLA interference and retaliation claims.

II. **ANALYSIS**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution affects the outcome of the suit.  *Id.*  On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49.  Additionally, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

"When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)); *see McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (citing *Taft*).  "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record."  *Taft*, 929 F.2d at 248 (citing

*John v. State of La. (Bd. of Tr. For State Coll. & Univ.)*, 757 F.2d 698, 705 (5th Cir. 1985));

*see Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (citing *Taft*).

### A. FMLA Claims

"The FMLA entitles qualifying employees up to 12 work weeks of leave[14] under

specified circumstances, including if they are suffering from a serious health condition."

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016) (citing 29 U.S.C. §

2612(a)(1)(D)). The Sixth Circuit "has recognized two theories of recovery under the

FMLA: interference and retaliation." *Id.* (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*,

681 F.3d 274, 282 (6th Cir. 2012)). "Although a plaintiff can proceed under both theories,

the proof needed for each claim differs." *Id.* at 307–08 (citing *Seeger*). "A plaintiff

proceeding under a retaliation theory must show discriminatory or retaliatory intent,

whereas a plaintiff alleging interference need not prove any unlawful intent on the part of

his employer." *Id.* at 308 (citing *Seeger*). As noted, Wright claims his FMLA rights were

violated under both theories.

**Interference.** "To establish a claim for interference under the FMLA, a plaintiff

must demonstrate that (1) he is an eligible employee, (2) the defendant is an employer

as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4)

the employee gave the employer notice of his intention to take leave, and (5) the

employer denied the employee FMLA benefits to which he was entitled. *Tennial*, 840

F.3d at 308 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481 485 (6th Cir. 2005)). The

---

[14] The statute permits an employee to take leave intermittently. *See* 29 U.S.C. § 2612(b)(1). According to HR and Safety Manager McDaniel, Wright was the only Stagnaro employee on intermittent FMLA leave. (Doc. 25 PAGEID 648–49 (59:10–60:2)).

10

"interference" theory is also referred to as the "entitlement" theory. *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

For purposes of its pending motion, Stagnaro concedes the first four elements but maintains that Wright cannot establish the fifth element "because Stagnaro honored his FMLA rights for two years and never denied a single request for FMLA leave at any time." (*See* Doc. 28 PAGEID 1245–46). Having reviewed the record evidence, the Court agrees.

From an operations perspective, Stagnaro admits that accommodating Wright's intermittent leave was inconvenient. According to driver supervisor Chris Berkley, "It caused a lot of disruption when he would call in with having to move guys around, but we moved guys around and covered his route whenever he used an FMLA day[.]" (Doc. 22 PAGEID 139 (15:1–5)). And when there were no extra "guys" to move around, Berkley would cover the route himself. (*Id.* PAGEID 142 (18:5–10)). Berkley also noted that Wright would usually wait until "right before his shift" to notify him that he was taking an FMLA day. (*Id.* PAGEID 159–60 (36:22–37:5) ("Mostly, within an hour or so. Sometimes, occasionally, in the middle of the night.")[15]).

Berkley shared with management his frustration about Wright taking intermittent FMLA leave. In a January 2, 2020 email to his supervisor, John Lammers, Berkley wrote, "As to no surprise fmla day for the worthless one we keep around." (*Id.* PAGEID 141 (17:4–23); Doc. 22-1 PAGEID 189).[16]

---

[15] Berkley testified that drivers report to work as early as 3:30 a.m. and as late as 7:00 a.m. (Doc. 22 PAGEID 160 (36:8–11)). Wright typically arrived between 5:30 a.m. and 6:00 a.m. (*Id.* PAGEID 160 (36:6–12)).

[16] Berkley later testified at his deposition, "I probably should have not said that at the time[.]" (Doc. 22 PAGEID 142 (18:1–2)). He explained:

Inconvenience aside, however, Berkley clearly understood from John Lammers that Wright was entitled to take (up to) two FMLA days per month.  (Doc. 22 PAGEID 136 (12:3–15), PAGEID 147 (23:3–18)).  And Wright testified, unequivocally, that "I took my days when I needed to," even when, for instance, Berkley told him (on February 28, 2020) "You need to push threw (sic) it" because there was no one to cover his route.  (*See* Doc. 26 PAGEID 959–60 (124:9–125:7), PAGEID 961–63 (126:12–128:18); Doc. 26-2 PAGEID 1170–76).[17]  Because Wright never was denied any leave to which he was entitled, the Court concludes that he cannot establish a claim for interference under the FMLA.  *Tennial*, 840 F.3d at 308 (citing *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) ("Analysis of the first four factors is unnecessary because [Plaintiff] has not pointed to any evidence in the record showing that he was denied FMLA benefits.  A benefit is denied if an 'employer interferes with the FMLA-created right to medical leave . . . . [Plaintiff] was never denied leave.  He was in fact granted it twice[.]")).  Accordingly, Stagnaro is entitled to judgment as a matter of law on Wright's FMLA interference claim.

Wright's position that he is entitled summary judgment on his FMLA interference

---

It is a frustrating job when someone calls in because we have to move so many people to cover that route.  A lot of the time, as a supervisor, I have to go out on that route if we can't get it covered by moving drivers around.

So it is hectic for us, and at the time, I was frustrated.  Like I said, I probably shouldn't have said it.  I didn't mean anything.  He is not a worthless employee, but I was frustrated at the time.

(*Id.* PAGEID 142 (19:5–15)). To accommodate the "big mess" that results when a driver calls in, Berkley sometimes offered Wright a helper in lieu of him taking an FMLA day.  (Doc. 22 PAGEID 163 (39:9–23)). And Wright confirmed that he sometimes asked Stagnaro to send a helper.  (Doc. 26 PAGEID 995 (160:4–12) ("Q. Ok. When you would ask them to send a helper, would they? A. Sometimes. Sometimes they would. Sometimes, I mean, there wasn't enough help.  They couldn't.")).

[17] According to VP Lammers, "We honored all of [Johnie's] FMLA days."  (Doc. 24 PAGEID 541 (85:1–6)).

claim—because Stagnaro "discouraged" him from using his FMLA leave in violation of 29 C.F.R. § 825.220(b)[18]—is without merit.  As just discussed, Wright testified that, without exception and regardless of whether his supervisor was irritated with him, "I took my day off."  (Doc. 26 PAGEID 962–63 (127:8–128:10)).

    *Arban*, *supra*, and *Hurtt v. Int'l Servs.*, 627 F. App'x 414, 424 (6th Cir. 2015), cited by Wright in support, are inapposite.  In *Arban*, the plaintiff testified that "he was asked to continue to perform work-related tasks while ostensibly on medical leave."  345 F.3d at 402.  When he refused, he was later fired.  *Id.* at 402–03.[19]  But no record evidence in this matter suggests that Wright was asked to perform work-related tasks when taking his FMLA days.  In *Hurtt*, an unpublished case, after the plaintiff requested FMLA leave, his employer: terminated his "guaranteed" and "forgivable" draw and instead placed him on a commission-only pay scale; backdated his commission pay resulting in him owing money to his employer; and terminated pre-payment of his travel expenses.  627 F. App'x at 421, 424.  The panel accordingly found that "these facts create[d] a triable issue of FMLA interference."  *Id.* at 424.  Wright, however, was simply asked to "push threw (sic) it."  And, in response, he pushed back and took his FMLA day.

         To establish the fifth interference element through a discouragement theory, a

---

[18] In part, this federal regulation provides that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).

[19] *But see Vess v. Scott Med. Corp.*, No. 3:11 CV 2549, 2013 WL 1100068, at *3 (N.D. Ohio Mar. 15, 2013) ("However, '[f]ielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights.'  *Reilly v. Revlon, Inc.*, 620 F. Supp. 3d 524, 537 (S.D.N.Y. 2009).  When such contact is 'limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments, employers do not violate the FMLA by making such calls.'  *Id.*  Thus, communications . . . for the purpose of facilitating the transition to Plaintiff's responsibilities, such as providing a computer password and identifying employees to fill in for Plaintiff, did not interfere with her FMLA leave as a matter of law.").

plaintiff must show that either he "tried to assert h[is] FMLA rights and was discouraged" *or* his employer's "actions would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise h[is] FMLA rights."  *Nolen v. Ohio Dep't of Rehab. & Corr.*, No. 3:17 CV 182, 2018 WL 6725395, at *3 (N.D. Ohio Dec. 21, 2018) (quoting *Vess*, *supra*, 2013 WL 1100068, at *2 (citing *Golden v. N.Y. City Dep't of Envtl. Prot.*, No. 06 CIV. 1587(DLC), 2007 WL 4258241, at *3 (S.D.N.Y. 2007))).  As a matter of law, the Court concludes that Berkley's "push threw (sic) it" text—taken in context—would not have "dissuaded a similarly situated employee of ordinary resolve" from requesting intermittent FMLA leave.  *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)).  But even with a chilling effect,[20] at bottom Wright must show that Stagnaro's "conduct, in fact, caused him to refrain from requesting or using FMLA leave." *Id.* (citing *Bonfiglio v. Toledo Hosp.*, No. 3:16CV2163, 2018 WL 5761220, at *12 (N.D. Ohio Nov. 1, 2018)).  Based on the record evidence, Wright cannot meet this burden. Thus, the Court will deny summary judgment to Wright as to his FMLA interference claim.

**Retaliation.**  A plaintiff can prove FMLA retaliation[21] either through direct or circumstantial evidence.  *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432 (6th Cir. 2014) (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008)).  "Direct evidence, 'if believed, requires the conclusion that unlawful

---

[20] Wright cites (*see* Doc. 30 PAGEID 1267 & n.2) driver supervisor Chris Berkley's "sudden" request for a doctor's note and FMLA paperwork on January 3, 2020 as additional evidence of discouragement.  (Doc. 26-2 PAGEID 1164 ("Ryan and John would like some kind of documentation of you visit to the doctor's today and the fmla")).  Berkley's request, however, was promptly retracted by a text from VP John Lammers.  (*Id.* PAGEID 1198 ("We will need paper-work from your visit today.  You are correct we already have your FMLA paperwork.  Thanks")).  Wright also cites Stagnaro's "institutional ridicule of his leave (earning him the title of 'worthless')."  (*See* Doc. 30 PAGEID 1267 & n.2).  There is no record evidence, however, that Wright knew about Berkley's "worthless one" email sent to Lammers.

[21] The "retaliation" theory is also known as the "discrimination" theory.  *Edgar*, 443 F.3d at 508.

14

discrimination was at least a motivating factor in the employer's actions.'" *Id.* (quoting *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 829 (6th Cir. 2000)). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). "The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [FMLA leave], but also that the employer acted on that predisposition." *Demyanovich*, 747 F.3d at 432 (quoting *DiCarlo*, 358 F.3d at 415). "If an employee successfully presents direct evidence that the employer acted with discriminatory motive, 'the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'" *Id.* (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002)).

The *McDonnell Douglas*[22] burden-shifting framework applies in cases of indirect (or circumstantial) evidence, including as to FMLA retaliation claims. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (citing *Edgar*, 443 F.3d at 508)). "To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) he engaged in an activity protected by the Act, (2) this exercise of his protected rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Tennial*, 840 F.3d at 308 (citing *Arban*, 345 F.3d at 404). "In order to establish such a causal connection, a plaintiff must show some type of retaliatory

---

[22] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) as modified by *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

intent." *Id.*

"The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997). Wright, however, argues both.

Direct evidence. Wright's proffered direct evidence of FMLA retaliation—Berkley's January 2, 2020 "worthless one" email to Lammers—fails as a matter of law. There is no testimony that Berkley played a role in the decision to separate Wright the following March. To the contrary, Berkley denied playing any part in the decision[23] and nothing in the record suggests otherwise. This circumstance clearly differs from the one in *Demyanovich*, where an employee's direct supervisor not only referred to him as a "liability" immediately after the employee requested FMLA leave but also made the ultimate decision to terminate the same evening. 747 F.3d at 432. Accordingly, the Court will deny summary judgment to Wright to the extent he contends that direct evidence supports his claim of FMLA retaliation.

Indirect evidence. There is, however, a question of material fact as to whether indirect evidence supports Wright's claim of FMLA retaliation. Summary judgment will be denied, then, to both Wright and Stagnaro in this regard.

Prima facie case. Stagnaro concedes that the first three elements of the *McDonnell Douglas* prima facie case. But because Stagnaro honored every FMLA day requested by Wright, it argues that Wright cannot establish a causal connection between his use of intermittent FMLA leave and his termination. (*See* Doc. 28 PAGEID 1247).

---

[23] (*See* Doc. 22 PAGEID 157 (33:11–16), PAGEID 164–65 (40:24–41:8)). Berkley further testified that he lacked authority to terminate any employee. (*Id.* PAGEID 167 (43:1–7)).

The Court disagrees. There is ample evidence in the record—including, of course, Berkley's "worthless one" email—from which a jury could conclude that Wright's immediate supervisors were irritated that they had to accommodate these sudden intermittent leave requests. And their irritation was no secret from upper management, including decision makers Jakubowski and McDaniel, even before the "worthless one" email was circulated.

VP Lammers was well aware that his direct reports Berkley and Gladen were frustrated over the effect on operations when Wright used an FMLA day. (Doc. 24 PAGEID 494 (38:5–21)). Lammers, in turn, told Jakubowski that the "team" was frustrated at the "pattern developing" as to when Wright would take his days. (Doc. 23 PAGEID 256–58 (30:6–33:8)). In response, Jakubowski asked McDaniel to put together a list so he could "look at the data and see what's happening." (*Id.* PAGEID 260–62 (34:10–36:5)). The "data" were compiled on a spreadsheet emailed by McDaniel to Jakubowski on December 17, 2019. (*Id.* PAGEID 263 (37:13–25); Doc. 23-1 PAGEID 376–77). Jakubowski noticed a pattern of Tuesday and Friday absences, Stagnaro's "largest" delivery days "when most cases go out on a truck[.]" (Doc. 23 PAGEID 264 (38:1–17)).

Lammers forwarded Berkley's January 2, 2020 "worthless one" email to Jakubowski and McDaniel with the preface, "Heads up. Called in using FMLA day." (Doc. 22-1 PAGEID 189). McDaniel responded to Jakubowski and Lammers, "[w]hich means tomorrow he will do the same." (*Id.*). McDaniel's prediction came true, according to the supplement to the December 17, 2019 spreadsheet that he prepared for Jakubowski, which included eight additional FMLA days taken between January 2, 2020 and March

17

13, 2020.  (Doc. 23 PAGEID 265–66 (39:7–40:8); Doc. 23-1 PAGEID 378).

"A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one."  *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).  When asked whether Wright's intermittent FMLA leave was an "inconvenience," GM Jakubowski countered that it instead "put a strain" on Stagnaro's labor force.  (*See* Doc. 23 PAGEID 266 (40:9–22) ("Q. Did [Mr. Wright's FMLA leave] disrupt the company's business?  A. It did not disrupt the company's business because we were still able to deliver product, but it did put a strain on our labor force.  And it did take people out of positions that they should have been in.  It did take people out of jobs they should have been doing, but we did get the job done.")).  Whether a jury credits Berkley's immediate supervisor left-holding-the-bag answer or Jakubowski's more diplomatic up-the-chain-of-command response, there is evidence of a causal connection.  For purposes of avoiding summary judgment, then, Wright has established a prima facie case of retaliation.  Having done so, the burden shifts to Stagnaro to show that it had a legitimate, non-retaliatory reason for its action.  *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 499 (6th Cir. 2016).

Legitimate non-retaliatory basis for termination and pretext.  HR and Safety Manager Ryan McDaniel testified that Wright was terminated for failure to report his March 12, 2020 injury in a timely manner as required by Stagnaro's Employee Handbook and Employee Safety Manual.  There is no dispute that Wright received copies of both publications and that the language therein mandates that employees "immediately" report any injuries.  There is also no dispute that Wright failed to report his Thursday injury to until the following Monday.

18

Wright contends that an "immediate" reporting requirement violates the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, and therefore cannot stand as a "legitimate" reason for discharge.  (Doc. 27 PAGEID 1230–31).  Section 11(c) prohibits an employer from discriminating against an employee for reporting a workplace injury, *see* 29 U.S.C. § 660(c), and the applicable regulations state that "a procedure is not reasonable if it would deter or discourage a reasonable employee from **accurately** reporting a workplace injury."  (*Id.* PAGEID 1230 (quoting 29 C.F.R. § 1904.35(b) (emphasis added)).  Here, Wright did not "immediately" appreciate the fact that he was injured when the pallet hit his foot.  Only after symptoms developed, for which he sought medical attention, did Wright realize that he had actually suffered an "injury" in the form of a fracture.  Wright seems to theorize that a requirement to immediately report an incident, irrespective of symptoms of injury, lends itself to inaccuracy.  As such, he regards it as unreasonable and discriminatory.

In the Court's experience, "immediate" injury reporting requirements are common in employment settings and well-grounded in risk-management principles.  Thus, the undersigned is reluctant to pronounce them *ipso facto* in violation of OSHA based on the limited authorities cited.  The Court consequently concludes that Stagnaro has proffered a legitimate, non-retaliatory reason for Wright's discharge, shifting the burden to Wright to put forth evidence of pretext.  *See Casagrande*, 666 F. App'x at 490.

A plaintiff can demonstrate pretext in one of three ways.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).  He can show that the stated reason (1) has no basis in fact or (2) was not the actual reason or (3) is insufficient to explain the employer's action.  *Id.*  A plaintiff need only produce enough evidence "**to rebut, but not**

**to disprove**" the employer's justification. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quotation marks and citation omitted) (emphasis added).

Wright contends that Stagnaro enforced its injury reporting "requirement" as a ruse to terminate him for his use of intermittent FMLA leave. He starts with the premise that, given the nature of the job, not every injury was reported:

> Q. Okay. What policies were not followed by the company?
>
> A. Well, as far as getting injured on the job and reporting every injury. I mean, we delivered beer. We smashed our fingers. Beer falls out of the truck on our head, you know, people pinch their hand between kegs. So every injury wasn't reported because we're beer drivers. We expect beer to fall out and certain injuries.
>
> Q. Okay.
>
> A. I mean, there's not an employee in there that hasn't had a beer fall on the head opening a door up, from beer leaning on it. There's not an employee that – you, know, that hasn't had – you know, bump their head going down cellar steps. There isn't an employee that hasn't pinched their finger, you know, putting a keg in the cooler.
>
> Q. So it's your testimony that these sorts of things were not reported?
>
> A. Yes, that's my testimony, not every injury was reported.

(Doc. 26 PAGEID 854–55 (19:21–20:16)). Whether or not true, because it lacks reference to any specific facts, Wright's self-serving testimony cannot be considered to defeat (or in support of) a motion for summary judgment. *See Robinson v. Georgia-Pacific Corrugated, LLC*, No. 1:18-cv-307, 2020 WL 473543, at *6 (S.D. Ohio Jan. 29, 2020) (citing *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 598–99 (6th Cir. 1999)); Fed. R. Civ. P. 56(e). His conclusory testimony aside, however, Wright otherwise produces enough evidence from which a jury could reasonably reject Stagnaro's explanation of why it fired him. *See Robinson*, 2020 WL 473543, at *7 (citing *Chen v.*

*Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

Berkley, Lammers, and Jakubowski all agree that Wright, on the days he drove his route, was a "good" worker.[24]  McDaniel and Jakubowski were systematically consistent in their testimony that they, alone, made the decision to separate Wright, to the exclusion of the Operations staff (and their collective frustration with honoring Wright's intermittent leave).  But there is a discrepancy in the record as to whether Lammers was present during the meeting.  Contrary to McDaniel's recollection that he was not, Jakubowski testified that Lammers was there.[25]  *Compare* (Doc. 25 PAGEID 619–20 (30:21–31:5)) *with* (Doc. 23 PAGEID 308–11 (82:8–84:24)).  This matters because, as recently as March 3, 2020 and in the wake of Stagnaro's confusion as to when Wright's new FMLA *four*-day certification took effect, Lammers sent McDaniel an email asking if they might "catch" Wright if he was "still under old parameters until end of March[.]"  (Doc. 24-1 PAGEID 575).

According to Jakubowski, Wright is apparently the first and only employee to be terminated by Stagnaro because he failed to timely report an injury.  (*See* Doc. 23 PAGEID 290–91 (64:17–65:2)).[26]  Wright finds this reason suspect because he wasn't fired (or otherwise disciplined) in 2018 when he did not immediately report his right knee

---

[24] (*See* Berkley Dep., Doc. 22 PAGEID 139 (15:7–13) ("Q. When Mr. Wright was working, what kind of worker was he?  A. A good worker, I guess."), PAGEID 140–41 (16:21–17:3); Lammers Dep., Doc. 24 PAGEID 487 (31:10–24) ("A. When he was there, he did what he was supposed to do.  He showed up and he did his job according to what he was going to do.  He would get in his truck and he would deliver the stuff and – he would deliver his product and return that day."); Jakubowski Dep., Doc. 23 PAGEID 249–50 (23:24–24:18) ("Q. When he was reporting to work, he did his job well? A. Yes."); *see also* McDaniel Dep., Doc. 25 PAGEID 619 (30:1–7) ("A. I wasn't involved in his job performance.  As far as I know, he came in and did his job when he was there.")).

[25] In line with McDaniel's testimony, Lammers denies playing any part in the discharge decision. (*See* Doc. 24 PAGEID 469–72 (13:9–16:2), PAGEID 536 (80:10–18)).

[26] Also, other than Wright's, Jakubowski was unable to recall any terminations in the recent past in which he was a final decisionmaker.  (Doc. 23 PAGEID 312–13 (86:23–87:17)).

injury.  Only after then-HR Manager Andy Wimberg noticed him limping did Wright explain why.  Wright also wasn't fired (or otherwise disciplined) in 2019 when he did not immediately report his left middle finger injury.  Current-HR and Safety Manager Ryan McDaniel testified that he instead counselled Wright that "all injuries needed [to be] reported[.]"  (Doc. 25 PAGEID 621 (32:5–16)).  But, like Wimberg, McDaniel did not "write him up" or otherwise discipline Wright.  (*Id.* PAGEID 621–22 (32:18–33:4); *see id.* PAGEID 623 (34:3–4) (McDaniel had a "corrective conversation" with Wright in lieu of discipline)).[27]  In mid-March 2020, though, approximately two weeks after Lammers asked McDaniel about "catching" Wright for using too many FMLA days, McDaniel and Jakubowski fired Wright for violating a rule he had twice broken with impunity.

As noted, Wright need only produce enough evidence to *rebut*, not disprove, Stagnaro's stated reason for termination.  Drawing all reasonable inferences in his favor, Wright has done so.  How this matter eventually resolves will depend heavily on credibility assessments that, of course, must be made by a jury during trial rather than by this Court on summary judgment.

## B. Disability Discrimination Claims under Federal and State Law

The ADA, as amended by the Amendments Act of 2008, makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Ohio Rev. Code § 4112.02(A) prohibits discrimination generally, including "discharge without just cause," against an employee

---

[27] Wright equivocated between being unable to recall this "corrective conversation" to denying outright that it even occurred.  (*See* Doc. 26 PAGEID 921–22 (86:6–87:11)).

because of his "disability."[28]

As with claims for retaliation under the FMLA, a plaintiff can prove a claim for discrimination based on wrongful termination under the ADA through direct or circumstantial evidence. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 79 (6th Cir. 2020). When analyzing an ADA discrimination claim based on circumstantial evidence, courts in the Sixth Circuit similarly use an adapted version of *McDonnell Douglas* burden-shifting framework. *Id.* at 79–80. Specifically, in such a circumstance, a plaintiff must show that (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011); *Plank v. Great Am. Fin. Res., Inc.*, No. 1:19-cv-935, 2021 WL 3089374, at *8 (S.D. Ohio July 22, 2021). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Brown*, 814 F. App'x at 80. If the defendant does so, the burden shifts to the plaintiff to show that the proffered reason is merely pretext. *Id.* (citing *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019)).

Wright's memorandum in opposition to Stagnaro's omnibus motion does not discuss his disability discrimination claims, let alone argue evidence upon which a jury could reasonably find in his favor. *Compare* (Doc. 28 PAGEID 1254–55; Doc. 33 PAGEID

---

[28] "Ohio courts follow federal law in regard to disability discrimination claims filed under O.R.C. § 4112.02." *Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563, 578 n.5 (6th Cir. Aug. 20, 2019) (citing *Bloomfield v. Whirlpool Corp.*, 984 F. Supp. 2d 771, 776 (N.D. Ohio 2013)).

1304) *with* (Doc. 30). Because he has "failed to meet his Rule 56 burden[,]" the Court considers these claims abandoned. *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (affirming trial court's finding that party's failure to properly respond to the arguments raised in a motion for summary judgment constituted an abandonment of those claims); *see Erwin v. Vill. of Morrow, Ohio*, No. 1:16-cv-1166, 2019 WL 1495921, at *15 (S.D. Ohio Apr. 4, 2019). Accordingly, Stagnaro is entitled to judgment as a matter of law on Wright's disability discrimination claims under federal and state law.

## C. Retaliation Claim under Ohio Rev. Code § 4123.90

Ohio Rev. Code § 4123.90 provides, in part, that "[n]o employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim . . . under the workers' compensation act for an injury . . . which occurred in the course of . . .his employment with that employer." To establish a prima facie case of workers' compensation retaliation, a plaintiff must establish that: (1) he engaged in protected activity by filing a claim; (2) his employer took adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action. *Barber v. Chestnut Land Co.*, 63 N.E.3d 609, at ¶ 44 (Ohio App. 7th Dist. 2016). As to the third element, "a **retaliatory state of mind** is part of showing the causal connection." *Id.* at ¶ 45 (emphasis added). Relevant factors include "punitive actions (such as bad performance reports or a change in salary level) occurring immediately after a claim is filed, the time period between the filing of the claim and the discharge, recent hostile attitudes, and whether a legitimate reason existed for the discharge." *Id.* at ¶ 55.

The first two elements of Wright's workers' compensation retaliation claim are

obviously satisfied:  he filed a workers' compensation claim in the wake of his March 2020 foot injury and he was subsequently terminated.  But Stagnaro argues that Wright has put forth no evidence of causal connection and, consequently, it is entitled to judgment as a matter of law.  Wright argues otherwise, highlighting the fact that he was terminated within a week of filing his claim and citing caselaw for the proposition that temporal proximity that is "very close" to when the employer learns of the protected activity alone satisfies a prima facie case.  (Doc. 30 PAGEID 1275 (citing *Barber*, 63 N.E.2d 609, at ¶ 56 & n.3 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 513, 525 (6th Cir. 2008))).

The Court concludes that temporal proximity *alone* is *in*sufficient to satisfy a prima facie case—as to causation—in an Ohio workers' compensation retaliation case.   In *Sutton v. Tomco Machining, Inc.*, the Ohio Supreme Court decided that Ohio "recognizes a common-law tort claim for wrongful discharge in violation of public policy when an injured employee suffers retaliatory employment action after injury on the job but before the employee files a workers' compensation claim or institutes or pursues a workers' compensation proceeding."  129 Ohio St. 3d 153, 950 N.E.2d 938, at ¶ 10 (2011).  The *Sutton* court additionally held that "the remedies available for the tort are limited to those provided by R.C. 4123.90."  *Id.*, 950 N.E.2d 938, at ¶ 37.  While the issue of causation was not before the *Sutton* court, the majority nonetheless noted that **"[b]ecause a discharge could be for reasons other than those related to workers' compensation**, **such as** a reasonable suspicion that the injury was not job related, **a disregard by the employee for the employer's safety rules**, or an immediate need for a replacement employee, **no presumption of retaliation arises from the fact that an employee is discharged soon after an injury**."  *Id.*, 950 N.E.2d 938, at ¶ 10 (emphases added); *see*

*Quesenberry v. Cleveland*, No. 103886, 2016 WL 4588219, at ¶ 21 (Ohio App. 8th Dist. Sept. 1, 2016) (temporal proximity alone insufficient to establish causal connection) (citations omitted). "Rather, the retaliatory nature of the discharge and its nexus with workers' compensation must be established by a preponderance of the evidence." *Sutton*, 950 N.E.2d 938, at ¶ 10.[29]

Nothing in the record suggests that Stagnaro was "hostile" toward Wright (or any other employee) filing claims for workers' compensation. When Wright twisted his knee in January 2018, then-HR Manager Andy Wimberg approached Wright because he saw that he was limping. (Doc. 26 PAGEID 896 (61:2–16)).[30] Stagnaro thereafter certified Wright's claim. (*Id.* 896–97 (61:17–62:11); Doc. 26-2 PAGEID 1147). And when he smashed his left middle finger in May 2019, part-and-parcel of delivering beer according to Wright,[31] Stagnaro nevertheless gave him a claim form to complete. (Doc. 26 PAGEID 919–21 (84:10–86:10); Doc. 26-2 PAGEID 1156). Finally, in 2020, even though he waited until March 17 to report an on-premises injury that occurred on March 12, Stagnaro

---

[29] The undersigned appreciates the distinction that *Sutton* involved an employee who was discharged after he was injured but *before* he filed a workers' compensation claim. This distinction is one without a difference, however, given the on-point discussion—albeit dicta—surrounding temporal proximity. Further, the *Barber* appellate court opinion noted that the Sixth Circuit decision in *Mickey* was a "general" retaliation case rather than a "workers' compensation retaliation" case.

[30] "Q. Got you. So you twisted your knee. And tell me what – what symptoms did you have as a result of that? A. My knee was sore, but it got worse. It was on a Friday maybe or Thursday. But Andy, he was the HR then. And his window was there, so he saw me limping when I was doing it. He was like, yeah, I see you was limping. And I let him know what happened, and then I went to the doctor, I think on a Monday, and got an x-ray. And after that other doctors' appointments came. Q. Had you reported that injury where you twisted your knee and it was sore? Had you reported that to Andy before he saw you limping? A. No. He saw me limping and then we talked about it. And I went to the doctor the following Monday." (Doc. 26 PAGEID 896 (61:2–16)).

[31] A. . . . As far as my finger, I mean, I'm not the only guy that's smashed his finger with beer. Showed my bosses in kind of like a joking way and showed Tony, hey, I'm – you know, I smashed my finger. He saw it was swole. Johnny Lammers, it was more of a joke because it was my middle finger, so it was more of a joke because it was something us guys go through delivering beer." (Doc. 26 PAGEID 894 (59:8–15)).

promptly certified his claim.

Notably, when deposed, Plaintiff categorically denied that he was fired because he

filed a claim for workers' compensation.

> Q. Do you believe Stagnaro terminated you because of your workers' compensation claim?
>
> A. I believe that it was because of my FMLA.
>
> Q. Are there any facts that lead you to believe that Stagnaro fired you because of your workers' comp claim?
>
> A. Not facts. I mean, I don't understand the question.
>
> Q. Okay. Well, and again, not trying to hide the ball, just trying to understand where you're coming from. Your complaint alleges that Stagnaro discriminated – retaliated against you, fired you because you filed a workers['] compensation claim.
>
> A. That's not the reason they fired me.

(Doc. 26 PAGEID 1000 (165:12–25)).[32] Irrespective of whether this testimony constitutes

abandonment-by-deposition, the Court finds Stagnaro's reference to it both reasonable

and instructive. *See Bush v. Lumileds, LLC*, No. 2:16-cv-11761, 2018 WL 4610867, *11–

12 (E.D. Mich. Sept. 26, 2018).[33] Having rejected Wright's argument that temporal

proximity alone satisfies a prima facie case of retaliation, the Court finds no other

evidence that would support a causal connection. Thus, Stagnaro is entitled to judgment

as a matter of law as to Wright's retaliation claim under Ohio Rev. Code § 4123.90.

---

[32] "Q. Why do you believe Stagnaro fired you? A. In retaliation for me having FMLA days. I think they got so frustrated with them days and they found a reason to let me go; a loophole, so to speak. Q. Any other reason you feel Stagnaro terminated you? A. That's my main reason there." (Doc. 26 PAGEID 999 (164:2–8)).

[33] Unlike the circumstance in *Bush*, Wright's testimony directly contradicts the allegations in his Complaint, a pleading drafted by the same attorney who defended his deposition. *See Bush*, 2018 WL 4610867, at *12.

### III.  <u>CONCLUSION</u>

Consistent with the foregoing, Plaintiff's Motion for Partial Summary Judgment (Doc. 27), directed to Plaintiff's federal Family and Medical Leave Act interference and retaliation claims (Count 1), is **DENIED**.  Defendant's Motion for Summary Judgment (Doc. 28), directed to all claims in Plaintiff's Complaint, is **GRANTED** with respect to Plaintiff's federal Family and Medical Leave Act interference claim (Count 1), his disability discrimination claim brought under federal and state law (Count 2), and his workers' compensation retaliation claim brought under state law (Count 3).  However, Defendant's Motion is **DENIED** as to Plaintiff's federal Family and Medical Leave Act retaliation claim (Count 1).

A final pretrial conference as to Plaintiff's remaining federal Family and Medical Leave Act retaliation claim will be reset by separate notice, at which time a trial date will be scheduled.

**IT IS SO ORDERED.**                              /s/ *Michael R. Barrett*
                                                              Michael R. Barrett, Judge
                                                              United States District Court